UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION

CASE NO. 0:15-CV-62218-JEM

PREMIER PARKS, LLC, a
Delaware Limited Liability Company,

      Plaintiff,

v.

CITY OF FORT LAUDERDALE,

      Defendant.

_____

### PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

Plaintiff, PREMIER PARKS, LLC ("Premier"), by and through its undersigned counsel and pursuant to Local Rule 56.1, hereby moves for final summary judgment on its claims against the City of Fort Lauderdale (the "City"), and, as grounds therefor, states as follows:

### Introduction

This is an action for declaratory and injunctive relief arising out of a Lease Agreement, entered into between the City and FTL Waterresort, LLC ("FTL Waterresort") for the development of a water park, and additional facilities, on property identified as Parcels 19B, 25, 26, and 27 (the "Property") of the Fort Lauderdale Executive Airport (the "Lease"). The Lease and a First Amendment to Lease Agreement ("Amendment") grant FTL Waterresort the right, *inter alia*, to develop, operate and profit from a water park and related facilities for a period of up to fifty years. The City selected, negotiated and entered into the Lease and Amendment without competitive bidding in violation of Section 8.09 of the City's Charter and Section 332.08, Florida Statutes, and, as a consequence, Premier seeks to enjoin performance of the Lease.

## FACTUAL BACKGROUND[1]

The Property is located at 5301 NW 12th Avenue, Fort Lauderdale, Florida, and consists of 64.32 acres. (SOF, ¶ 1).  Until recently, the Property was part of the Fort Lauderdale Executive Airport (the "Airport"). (*Id.*, ¶¶ 1, 19 & 23).  According to a 2015 appraisal procured by the Airport, the fee simple value of the Property is $14,484,000, and the leased fee interest value is in excess of $10,000,000.  (*Id.*, ¶ 2).

The Property is a portion of the land conveyed by the Federal Government to the City for use as a municipal airport by virtue of a Quitclaim Deed dated March 11, 1947.  (*Id.*, ¶ 3).  The Quitclaim Deed restricted use of the Property to airport and airport facilities.  (*Id.*, ¶ 4).  The Property, however, has been utilized by sports teams and for other special events pursuant to license agreements.  (*Id.*, ¶ 4).  The City previously permitted the New York Yankees and the Baltimore Orioles to utilize a portion of the Property known as Fort Lauderdale Stadium for spring training. (*Id.*).  Additionally, the City currently licenses a portion of the Property known as Lockhart Stadium to the Miami FC, L.L.C. d/b/a Fort Lauderdale Strikers for soccer.  (*Id.*).

### The City Enters Into A "No-Bid" Lease With FTL Waterresort

After the Baltimore Orioles relocated their spring training operations to Sarasota, Florida in or about 2010, the City considered several options for the Property that included other sporting related uses and events, as well as the construction of a water park.  (*Id.*, ¶ 5).  In 2010, the City was contacted by individuals interested in constructing a "Schlitterbahn" water park on the Property.  (*Id.*, ¶ 6).   The City met with representatives of Schlitterbahn and Recreational Development Corporation ("RDC"), its general contractor, in or about 2010.  (*Id.*).

---

[1]     The Statement of Facts is drawn from Premier's "Statement of Material Undisputed Facts Supporting Its Motion for Final Summary Judgment," filed contemporaneously herewith in accordance with S.D. Fla. L.R. 56.1 and incorporated herein by reference.  For ease of reference, such document is abbreviated herein as "SOF."

The City did not advertise for an opportunity to compete for the Lease and development of the Property as an amusement park. (*Id.*, ¶ 7). Section 8.09 of the City's Charter requires that prior to entering into a lease of City-owned property with a third party, the City must advertise its intention to enter into a lease and receive competitive bids. (*Id.*, ¶ 27). Instead of inviting competitive bids for the lease and development of the water park, the City decided to negotiate exclusively with those interested in constructing the Schlitterbahn water park. (*Id.*, ¶¶ 7 & 36).

The City also faced several legal impediments in attempting to lease the Property. Besides the Quitclaim Deed, which restricted the use of the Property to airport and airport facilities, and Section 8.09 of the City's Charter, which requires competitive bidding for the leasing of city-owned property, the City needed Federal Aviation Administration ("FAA") approval to lease the Property for purposes of the construction of a water park. (*Id.*, ¶ 8). In addition, the Property was not zoned for commercial recreational purposes, including for use as an amusement water park. (*Id.*, ¶¶ 31, 37 & 38). Thus, the water park concept apparently languished for several years while the FAA considered the concept and potential lease terms. (*Id.*, ¶ 8).

Continuing to deal exclusively with representatives of Schlitterbahn, the City proceeded to negotiate lease terms with Schlitterbahn during 2014. On or about July 10, 2014, the City adopted Resolution No. 14-118, authorizing the City Manager to execute the Lease in favor of FTL Waterresort (a new corporate entity formed by Schlitterbahn). (*Id.*, ¶ 9). The term of the proposed Lease was for 30 years, with up to two additional five-year renewal periods. (*Id.*, ¶ 10). The Lease states that the water park is intended to enhance the Fort Lauderdale Industrial Airpark; however, the Property is not within the Industrial Airpark boundaries. (*Id.*).

Resolution 14-118 described the proposed project as a "one-of-kind economic

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

development project that will transform the existing Fort Lauderdale Stadium property and adjacent parcels into a world class resort featuring a five star waterpark along with amusement rides, swimming pools, sports and recreational activities, summer camps, resort lodging, destination retail, and live entertainment." (*Id.; see also* Ludovico Decl. Ex. "A"). Resolution 14-118 further recites that the execution of the Lease "is an opportunity to realize revenue from property that has long been undervalued." (*Id.*).

The Resolution is also notable for what it *fails* to include. While the Resolution recites that entering into the Lease "is in the best interest of the City," it is silent on whether the proposed Lease will "aid in the development" of Fort Lauderdale Executive Airport (or a portion of it) as an "industrial center") and, further, does not include a "general plan for the development" of such site as an "industrial center." (*Id.,* ¶ 34). The Resolution also fails to include a declaration that the approved Lease "is the most advantageous lease" that the City can make at the time of the area involved. (*Id.*). In fact, the City admitted that there was no effort made to discuss, explore or investigate whether any other water park developer could have offered more advantageous lease terms than FTL Waterresort. (*Id.*, ¶ 35). Additionally, the City Manager, Lee Feldman, failed to "certify" to the City Commission that the leasing of the Property is in the best interests of "the development of said *industrial center*" and that the Lease is "*the most advantageous lease*" that the City can make at the time of the area involved. (*Id.,* ¶ 34). Each of these requirements is set forth in Section 8.10 of the City's Charter, the specific provision relied on by the City to avoid competitive bidding on the Lease. (*Id.*, ¶ 30).

**<u>The FAA Exercises Its Right to Reject the Lease, Rendering It Ineffectual</u>**

By its terms, the Lease was subject to and subordinate to certain covenants and restrictions set forth in the Quitclaim Deed dated March 11, 1947. (*Id.*, ¶ 11). Further, the

effective date of the Lease was specifically conditioned upon the approval thereof by the FAA. (*Id.,* ¶ 12).  Towards that end, Section 6.01 of the Lease states, in pertinent part:

> 6.01 This Lease is specifically conditioned upon approval in writing by the FAA, signed by an authorized representative of that agency.  The date of approval by the FAA shall be the effective date of the Agreement.

(*Id.*).

On November 13, 2014, the FAA rejected the approval of the Lease.  (*Id.,* ¶ 13).  Instead, the FAA concluded that if the City wished to pursue development of the Property through a lease, it must purchase the Property and request a release of the Quitclaim Deed conditions. (*Id.*).  Since FAA approval did not occur, the Lease did not go into effect.  (*Id.*).

As a consequence of the FAA's decision, on April 29, 2015, the City submitted another request to the FAA seeking the release of Property from the Quitclaim Deed in order to "reuse [the Property] for commercial development."  (*Id.,* ¶ 14).  The City further advised the FAA that the Property is not needed for "any public airport purposes."  (*Id.*).

In response to the City's request, the FAA communicated required terms for the purchase of the release of the Property from conditions of the Quitclaim Deed.  (*Id.,* ¶ 15).  The terms were set forth in a July 6, 2015 letter from the FAA to the City.  (*Id.*).  As set forth in the FAA's letter, a release of property is "only granted when it is clearly shown such property is no longer needed to directly support an airport purpose or activity…." (*Id.*).  The FAA's terms required, *inter alia,* that the City pay $12,085,000 from its General Fund over ten years, and update the Airport Layout Plan to reflect the removal of the Property from the Airport boundaries.  (*Id.,* ¶ 16).  The FAA terms and Deed of Release expressly contemplate removal of the Property from the Airport, and further authorize the City to "sell and convey title to the above described property for commercial purposes." (*Id.*, ¶ 16).

5

On August 18, 2015, the City approved the terms set forth in the FAA's letter and a form of Deed of Release from the FAA. (*Id., ¶* 17). The City's approval is memorialized in Resolution No. 15-162, adopted by the City Commission on August 18, 2015. (*Id.*). Resolution No. 15-162 provides City Commission approval of the "purchase of the Property for the proposed Schlitterbahn Waterpark." (*Id.*). The City executed a copy of the July 6, 2015 letter and the Deed of Release on September 8, 2015. (*Id., ¶* 18).

As a consequence of the July 6, 2015 letter agreement and Deed of Release, which were executed on September 8, 2015, the Property is no longer part of the Airport. (*Id., ¶* 19). This is also evidenced by, *inter alia*, the fact that the City's Department of Transportation and Mobility, which previously administered the Property, ceased its oversight of the Property after September 8, 2015. (*Id.*). Further, the City's Airport Manager, Rufus James ("James"), admitted that the Property is no longer part of the Airport. (*Id.*). During his deposition, the City Manager, Lee Feldman, testified that he would defer to Mr. James, as to the airport boundaries. (*Id.*)

**The City Enters Into An Amended Lease with FTL Waterresort**

On October 2, 2015, the City posted an agenda for a public meeting scheduled for October 6, 2015. (*Id., ¶* 20). One of the agenda items was a proposed resolution approving the First Amendment to Lease Agreement between the City and FTL Waterresort. (*Id.*). The meeting packet also included a memorandum from Lee Feldman, the City Manager, recommending that the City Commission of the City approve the proposed resolution authorizing the City Manager to execute the Lease Amendment. (*Id.*)

On October 5, 2015, Premier delivered a letter to the City urging it to cease and desist from taking any action in furtherance of the Lease and Amendment, and to permit an opportunity

for competitive bidding pursuant to Section 8.09 of the City's Charter. (*Id.*, ¶ 21). Premier then appeared at the City Commission's meeting on October 6th to reiterate its objection and request the opportunity to submit a competing bid. (*Id.*). The City denied Premier's request. (*Id.*)

Despite the FAA's decision, Premier's written objections and those made on the record at the October 6, 2015 City Commission meeting, the City approved the Amendment at that meeting. (*Id.*, ¶ 22). The City's approval of the Amendment is memorialized by Resolution No. 15-213, which authorizes the City Manager to execute a First Amendment to Lease between the City and FTL Waterresort. (*Id.*). The Lease Amendment, *inter alia,* recites that there has been "some changes of circumstances and time-frames that have occurred since the Lease Agreement was executed." (*Id.*, ¶ 23). The Lease Amendment removes the requirement for FAA approval (*Id.*), and enlarged the renewal option period from ten years to up to twenty years. (*Id.*). It also contained other modifications, including striking the words "within the Airport" at Section 12.01(b)(5), evidencing the fact that the Property is no longer part of the Airport. (*Id.*)

Just like Resolution 14-118 approving the original Lease, Resolution 15-213 failed to comply with the conditions set forth in Section 8.10 for leasing city owned property without competitive bidding. While Resolution 15-213 recites that entering into the Lease Amendment "is in the best interest of the City," it is silent on whether the proposed Amendment will "*aid in the development*" of Fort Lauderdale Executive Airport (or a portion of it) as an "*industrial center*") and, further, does not include a "*general plan for the development*" of such site as an "industrial center." (*Id.*, ¶ 33). Resolution 15-213 also fails to include a declaration that the approved Lease "*is the most advantageous lease*" that the City can make at the time of the area involved. (*Id.*, ¶ 34). Indeed, the City did not take any action to investigate other developers or whether the terms, including the rental amount, were commercially reasonable of if they were the

most advantageous terms.   (SOF, ¶¶ 35 &36).   Additionally, just like the prior resolution approving the Lease, the City Manager failed to "certify" to the City Commission that the leasing of the Property is in the best interests of "the development of said *industrial center*" and that the Lease is "*the most advantageous lease*" that the City can make at the time of the area involved. (*Id.*, ¶ 34).   Each of these requirements is set forth in Section 8.10 of the City's Charter, the specific provision relied on by the City to avoid competitive bidding on the Lease.  (*Id.*, ¶ 30).

By entering into the Lease and Amendment without competitive bidding, the City has provided an unfair competitive advantage to a competitor developer.  The terms of the Lease and Amendment are extremely advantageous to FTL Waterresort, and provide it with an enormous advantage over any competitor.  (*Id.*, ¶ 24).[2]  Premier is a nationwide developer and operator of amusement parks, including one in Florida that is located approximately 50 miles away from the Property.  (*Id.* ¶ 39).  Schlitterbahn is a direct competitor of Premier, and if FTL Waterresort (its affiliate) is permitted to move forward with the Lease and develop a water park on the Property in contravention of the City's own competitive bidding laws, Premier will suffer substantial damages arising from the City's Lease to a competitor within the same geographic market.  (*Id.* ¶ 40).

**The Commencement of the Instant Action**

On October 21, 2015, Premier commenced the instant action by filing a Complaint for Declaratory and Injunctive Relief [D.E. 1].   The Complaint asserts that the Lease and Amendment violate Florida law, and in particular, Section 8.09 of the City's Charter and Section

---

[2]     For example, there is no provision for additional rent or percentage rent based on FTL's Waterresort's revenue. (SOF, ¶ 24).  Additionally, FTL Waterresort was not required to provide any performance security, or evidence of financing, and has unilateral rights to terminate the Lease. (*Id.*).  Despite the stated effective date of October 6, 2015, FTL Waterresort has the right to terminate the Lease without payment or penalty on or before July 1, 2016.  (*Id.*, ¶ 25).  FTL Waterresort may also terminate the Lease prior to the commencement of construction if it determines that the project is not financially viable or sustainable. (*Id.*).

332.08, Florida Statutes, because they were entered into without any competitive bidding.  The Complaint further alleges that the Lease and Amendment do not fall within the exceptional circumstances set forth in Section 8.10 of the City's Charter for avoiding competitive bidding because, *inter alia*, (a) Section 8.10 does not apply to the lease of airport property for use as an amusement park, and (b) even if it did, the City has not satisfied the conditions of Section 8.10. (*Id.*, ¶ 35).  The Complaint seeks a declaratory judgment pursuant to 28 U.S.C. § 2201, declaring that the Lease and Amendment are "invalid, null, and void," as well as an order permanently enjoining the City from performing the executed Lease and Amendment.  (*Id.*, p. 10).

## ARGUMENT

### A.      Standard of Review

Federal Rule of Civil Procedure 56(c) provides that summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law."  In applying this standard, the Court must view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598 (1970).  However, the non-moving party "[m]ay not rest upon the mere allegations and denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."  Fed. R. Civ. P. 56(e).  As explained by the Supreme Court, "[t]he mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505 (1986).  Thus, the party opposing summary judgment "must

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

do more than simply show that there is some metaphysical doubt as to the material facts."
*Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586, 106 S.Ct. 1348 (1986).

## B.   <u>The Lease and Amendment Flout the City's Competitive Bidding Requirements</u>

"Competitive bidding requirements are designed to protect the public from collusive
contracts and from the ill effects of official favoritism in public procurement; and to ensure fair
competition among bidders for the public good." *Harris v. School Board of Duval County,* 921
So.2d 725, 735 (Fla. 1st DCA 2006). [3] "'Florida's competitive bid statutes are enacted for the
protection of the public,'" and therefore, there "is a great public interest in ensuring that
contracts be awarded to effectuate the intent of the competitive bid laws." *City of Sweetwater v.
Solo Const. Corp.* 823 So.2d 798, 802 (Fla.3d DCA 2002).  Consequently, competitive bidding
statutes and ordinances should be broadly construed to protect the public trust.  *See Board of
Public Instruction of Broward County v. Doran,* 224 So.2d 693 (Fla. 1969) ("Statutes enacted for
the public's benefit should be interpreted in a manner most favorable to the public."); *Wester v.
Belote,* 138 So. 721, 724 (Fla. 1931) (competitive bidding statutes must be afforded "a
construction always which will fully effectuate and advance their true intent and purpose and
which will avoid the likelihood of same being circumvented, evaded, or defeated").[4]

Section 8.09 of the City's Charter requires that prior to entering into a lease of city-
owned property with a third party, the City must advertise its intention to enter into a lease, and
entertain competitive bids.  (SOF, ¶ 27).  By its express terms, Section 8.09 broadly applies to
"*any* lands, improvements, public buildings, recreational parks or facilities, golf courses, public

---

[3]   *See also Dep't of Lottery v. Gtech Corp.*, 816 So. 2d 648, 651 (Fla. 1st DCA 2001) ("Long ago[,] the Florida
Supreme Court made it clear that public bidding laws were designed to prevent "opportunities for favoritism,
whether any favoritism is actually practiced or not. . . . This basic tenant [sic] remains the law of Florida.").
[4]   *See also Miami Marinas Ass'n, Inc. v. City of Miami,* 408 So.2d 615, 615 (Fla. 3d DCA 1981) ("Competitive
bidding statutes are enacted for protection of the public . . . and should be construed in a manner to avoid their
circumvention.") (citing cases)

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

beaches, public utility plants, or any public works or public property of any kind . . . owned or

operated by the City." (*Id.*). Section 8.09 states in pertinent part:

> [The] City is hereby empowered to lease or concession to private persons, firms, or corporations, for nonpublic purposes, any lands, improvements, public buildings, recreational parks or facilities, golf courses, public beaches, public utility plants, or any public works or public property of any kind[,] including air space over public property owned or operated by the City of Fort Lauderdale, and not needed for governmental purposes, whether used in a governmental or in a proprietary capacity, for a period of not more than fifty (50) years, plus such length of time, not to exceed five (5) years, determined by the City Commission to be reasonably necessary to complete construction of the improvements for the demised premises by such persons, firms or corporations. . . .

> Each lease shall be authorized only after public hearing, under authority of a resolution duly adopted at a meeting duly held at a designated adjourned meeting, under the following conditions, to wit: . . .

>> (c)    At any time, not less than thirty (30) days nor more than sixty (60) days, after the adoption of such resolution the land and improvements *shall be offered upon competitive conditions* for lease as desired and a notice shall be published by the city in the official newspaper for two (2) issues prior to the date set for receiving such bids for lease, with the first publication not less than ten (10) days before said date of receiving bids and the second publication one (1) week after the first, on which date sealed bids shall be received by the city commission for lease of said publicly owned lands and facilities. The sealed bids must be accompanied by cash, cashier's check or certified check payable to the city in an amount equal to at least ten (10) percent of the first year's rental. The city commission, in offering such public property, or public owned facility for lease, shall set out in said resolution and notice such terms and conditions as deemed pertinent under which said facility will be leased and the number of years for which said facility shall be leased. The city commission shall consider any and all proposals and accept the proposal which, in its judgment, shall be the most

> advantageous lease for the city; but the city
> commission may reject any and all bids. . . .

(A copy of Section 8.09 is attached to the Ludovico Decl. as Exhibit "I").

It is axiomatic that a municipality's charter is the paramount authority and governing instrument of the municipality (indeed, the charter constitutes the "Constitution" of the municipality),[5] and any ordinance enacted in violation of a municipality's charter is unlawful, null and void. *See Robert G. Lassiter & Co. v. Taylor,* 99 Fla. 819, 128 So. 14 (1930) (affirming injunction restraining a Florida municipality from making further payments on contract which was in violation of city charter requiring competitive bidding because such contract was "illegal and void"); *Homestead-Miami Speedway, L.L.C. v. City of Miami,* 828 So.2d 411 (Fla. 3rd DCA 2002) (affirming order that lease in violation of city charter requiring competitive bids was *"null, void and of no further legal effect*.") (emphasis added); *see also City of Key West v. Key West Hand Print Fabrics, Inc.,* 74 B.R. 482 (S.D. Fla. 1987) (King, J.) ("[w]hen a city enters into a contract in a manner violative of its own city charter or ordinance, the contract is void.").

Additionally, Section 332.08, Florida Statutes, mandates that when city-owned property "acquired for airport purposes" is to be sold or leased because it is no longer needed for "aeronautic purposes," the city must comply with the requirements of its charter governing the sale or leasing of "similar municipally owned property." Fla. Stat. § 332.08(1)(d). Here, the requirements of the City's Charter governing the sale or leasing of "similar municipally owned property" are set forth in Section 8.09, which ***mandates*** a competitive bidding process. Indeed, in prior instances involving City-owned property that was no longer needed for governmental purposes, the City utilized a competitive bidding process prior to entering into any lease

---

[5]     *See City of Miami Beach v. Fleetwood Hotel. Inc.*, 261 So. 2d 801, 803 (Fla. 1972) ("[T]he paramount law of a municipality is its charter (just as the State Constitution is the charter of the State of Florida), and gives the municipality all of the power it possesses . . . .")

agreements with third parties.  (SOF, ¶ 29 [citing Oasis Café and Bryan Homes, formerly the River House, as examples of leases that went out for competitive bids within the last year])

In the matter at bar, it is undisputed that the City did not comply with—or even attempt to adhere to—Section 8.09.  The City has admitted that it did not advertise a competitive solicitation for the Lease or Amendment, or otherwise attempt to comply with the procedures spelled out in Section 8.09.  (SOF, ¶ 7).  Instead, by its own admission, the City negotiated *exclusively* with FTL Waterresort (*Id.*, ¶¶ 7 & 28), and did not invite or seek bids from other developers, much less explore or investigate whether any other water park developer could have offered more advantageous lease terms than FTL Waterresort.  (*Id.*, ¶¶ 35 & 36).  The City maintains that the Lease and Amendment are *exempt* from competitive bidding pursuant to Section 8.10 of the City's Charter, and thus, the City was not required to comply with Section 8.09. (*Id.*, ¶ 30)

**B.     Section 8.10 of the City's Charter Does Not Exempt the Lease or Amendment
        From the Competitive Bidding Requirements Mandated by Section 8.09**

Section 8.10 of the City's Charter provides an exception to Section 8.09 for the lease of property at the Fort Lauderdale Executive Airport.  (Ludovico Decl., Ex. "I").  Section 8.10 provides that "[n]otwithstanding anything herein to the contrary, relative to the requirements of leasing city owned property, the city commission acting through the city manager shall have the power to negotiate any and all leases of land within the city owned airport known as Fort Lauderdale Executive Airport . . .; provided, however, that the following conditions are fulfilled:

> (a)     No lease shall be for a term longer than ninety-nine (99) years;
>
> (b)     the lessee pursuant to the requirements of the lease shall be required to construct suitable improvements on the leased premises that will be of such a nature that they will *aid in the development* of said Fort Lauderdale Executive Airport (Prospect Field), or that

portion of it available for such development, *as an industrial center*;

(c)    *a general plan for the development* of such site *for an industrial center* shall first have been adopted by resolution of the city commission, although this requirement shall not prevent subsequent amendments of such plan; and

(d)    the city manager certifies to the city commission and the city commission by resolution declares that the leasing of the property is in the *best interests of the city and the development of said industrial center* and is the *most advantageous lease* that the city can make at the time of the area involved."

(Ludovico Decl., Ex. "J") (emphasis added).  If each of these conditions has been met, "[n]o advertising or solicitation for public bid shall be required in connection with such leases."  (*Id.*).

As a municipal charter provision, "strict compliance" with the requirements of Section 8.10 is required.  *See Nelson v. ex rel. Axman*, 83 So.2d 696, 698 (Fla. 1955) ("We have held that an ordinance of a municipal corporation is not enforceable until every provision of the city charter necessary to give it legal existence has been strictly complied with.") (citing *Adams v. Isler*, 134 So.2d 535, 538 (1931)).  It is also a fundamental canon of statutory construction that exceptions to a statutory requirement are to be ***narrowly construed***.  *See Samara Dev. Corp. v. Marlow*, 556 So.2d 1097, 1100 (Fla. 1990) ("[I]t is a well-recognized rule of statutory construction that exceptions or provisos should be narrowly and strictly construed.") (citing *Farrey v. Bettendorf*, 96 So.2d 889 (Fla. 1957); *Coral Cadillac, Inc. v. Stephens*, 867 So. 2d 556, 559 (Fla. 4th DCA 2004) ("It is also a basic tenet of statutory construction that exceptions or provisos should be narrowly and strictly construed.") (citing *Samara*, 556 So.2d at 1100)

1.    Section 8.10 does not apply to the lease of airport property for use as an amusement park; use is limited to the development of an "industrial center."

By its express terms, Section 8.10 applies *only* to leases of Airport property that will "aid in the development" of the Airport (or the portion of it available) as an "*industrial center*."

(Ludovico Decl., Ex. "J").  One of the conditions expressed in Section 8.10 is that the lessee (here, FTL Waterresort) be "required to construct suitable improvements on the leased premises that will be of such a nature that they will *aid in the development* of said . . . Airport . . ., or that portion of it available for such development, as an *industrial center*."  *Id.* (emphasis added)

The City's own statements unequivocally reveal that the proposed water park project does not "aid in the development" of the Airport (or any portion of it) as an "industrial center." In its responses to interrogatories and requests for admission, the City admitted that the proposed water park is a "Commercial Recreation Use" as defined by the City's Code of Ordinances. (SOF, ¶ 37).  Further, Rufus James (the present Airport Manager) and Clara Bennett (the past Airport Manager) testified in their depositions that the proposed project is *recreational*, not industrial.  (*Id.,* ¶ 38).  Both James and Bennett testified as to the Airport Master Plan and the fact that the Plan has never been to develop the Property for aviation or industrial usage.  (*Id.*). The Airport Master Plan provides that the usage of the leased parcels was planned for conservation/recreational purposes.  (*Id.*).  While the Lease states that the water park is intended to enhance the Fort Lauderdale Industrial Airpark, the Property is not within the "Industrial" Airpark boundaries.  (*Id.*, ¶ 10)

Further, the Resolutions approving the Lease and Amendment make no reference to the development of the Property as an "industrial center."   (*Id.*, ¶ 31).   To the contrary, both Resolutions refer to the proposed water park as a "resort" development featuring "a five star water park, along with amusement rides, swimming pools, sports and recreation activities, summer camps, resort lodging, destination retail, and live entertainment." (Ludovico Decl., Exs. "A" & "G").  That is a far cry from an "industrial center."  The Resolutions also reveal the City's motivation for the project—"an opportunity to realize revenue from property that has long been

undervalued." (*Id.*).

Any notion that a lease for a water park could "aid in the development" of the Property as an "industrial center" is also belied by the fact that the Airport is already ***fully developed***. (*Id.*, ¶ 31).  There is no more property at the Airport to develop for aviation or aviation support usage. (*Id.*).  Both Bennett and James testified as to the Airport Master Plan and the fact that the plan has never been to develop the Property for aviation or industrial usage.  (SOF, ¶ 38).  Further, the City's April 2015 letter to the FAA requesting the buyout also confirms that the Property was not needed for any public airport purpose.  (*Id.*, ¶ 14).   Accordingly, the construction of the proposed water park will not "aid in the development" of the Airport or any portion available for development as an "industrial center."

2.     <u>The City has not satisfied the conditions of Section 8.10 in any event.</u>

The Resolutions adopted by the City also fail to satisfy condition (c) of Section 8.10, which requires that "*a general plan for the development* of such site *for an industrial center* shall first have been adopted *by resolution* of the city commission."   (Ludovico Decl., Ex. J) (emphasis added).  Neither of the Resolutions the City adopted—Resolution No. 14-118 and Resolution 15-213—specify or identify a "general plan for the development" of the site as an "industrial center."  (SOF, ¶ 32 & 33; Ludovico Decl., Exs. A & G).  Both Resolutions simply authorize the City Manager to execute the Lease and Amendment with FTL Waterresort.  (*Id.*). The words "industrial" do not appear anywhere in either Resolution, and, likewise, there is no development "plan" specified.  (SOF, ¶ 34).  The City Manager, Lee Feldman, admitted in his deposition that the Resolutions enacted by the City with respect to the leasing of the Property to FTL Waterresort do not provide a "general plan for the development" of the Property as an "industrial center"; instead, according to Mr. Feldman, the Resolutions just simply approved the

Lease and Amendment.  (SOF, ¶ 32).

Although the City initially maintained that Resolution No. 14-118, which approved the Lease, sets forth the "general plan" for the development of the Property, there is no language anywhere in that Resolution providing for "a general plan" to develop the Property as an "industrial center."  (SOF, ¶¶ 31 & 32).  Likewise, Resolution No. 15-213, which approved the First Amendment to Lease, contains no reference to the "development" of Fort Lauderdale Executive Airport as an "industrial center."  (*Id.*, ¶ 33).  To the contrary, both Resolutions merely describe the Schlitterbahn project as a "one-of-a-kind economic development project" that will transform the Property into a "world class resort featuring a five star water park along with amusement rides, swimming pools, sports and recreational activities, summer camps, resort lodging, destination retail, and live entertainment."  (Ludovico Decl., Exs. "A" & "G").  Such language—which simply describes "resort" amenities—does not come close to ***strictly complying*** with the condition precedent of Section 8.10 requiring the City—***by way of a resolution***—describe a "general plan for the development" of the site (or a portion of it) "as an industrial center."

Further, in contravention of Section 8.10(d), the City Manager failed to certify to the Commission that the Lease was "*the most advantageous lease*" that the City could make at the time of the area involved.  (SOF, ¶ 34).  Likewise, the City Commission's Resolutions of July 10, 2014 and October 6, 2015 fail to make the necessary finding that the leasing of the property is in "the best interests of the city and the development of said *industrial center*" and is "*the most advantageous lease*" that the city can make at the time of the area involved.  (*Id.*; Ludovico Decl., Exs. "A" & "G").

Indeed, there was no effort by the City to discuss, explore or investigate whether any

other amusement park developer could have offered more advantageous lease terms than FTL Waterresort.  (SOF, ¶ 35).  Feldman, the City Manager, testified that the City did not reach out to other amusement park developers for comparative purposes.  (*Id.*).  The City did not take any action to investigate other developers or whether the terms, including the rental amount, were commercially reasonable of if they were the most advantageous terms.  (*Id.*, ¶ 36).  Thus, the City is attempting to tie up the Property for up to 50 years without any idea--or even an interest—in learning whether another developer could offer better terms.  This is precisely why competitive bidding requirements and municipal charter provisions are ***strictly construed***—to protect the public from "the ill effects of official favoritism in public procurement."[6]

Because the Lease between the City and FTL Waterresort failed to strictly comply with Section 8.10 of the City's Charter in several material respects, it is ***null and void***.  *See, e.g.*, *Wester,* at 724 ("That a contract made by public officers in violation of the statutes requiring them to be let pursuant to competitive bids, to the best responsible bidder, is *absolutely void,* and that no rights can be acquired thereunder by the contracting party, is beyond question in this jurisdiction.") (emphasis added); *Palm Beach County Health Care District v. Everglades Memorial Hospital,. Inc.,* 658 So.2d 577 (Fla. 4th DCA 1995) ("[a]greements entered into by public bodies which fail to comply with statutory requirements are *void*") (emphasis added); *City of Miami Beach v. Klinger,* 179 So.2d 864 (Fla. 3rd DCA 1964) (holding contract to be null and void for failing to comply with city charter and enjoining performance of contract); *Armco Drainage & Metal Products, Inc. v. Pinellas County* 137 So.2d 234, 236 (Fla. 2d DCA 1962) ("If

---

[6]    The City's cavalier attitude towards competitive bidding requirements is documented in a 2013 report issued by the Broward Office of the Inspector General ("OIG").  (A copy of the OIG Final Report is annexed to the Complaint as Exhibit "F").  Specifically, the OIG concluded that the City "engaged in misconduct" when it awarded RDC (FTL Waterresort's contractor in this project) a $32 million contract for the design and construction of the Fort Lauderdale Aquatic Complex. (Compl., ¶ 41).  In its Final Report dated July 24, 2013, the OIG found that the City improperly negotiated the Aquatic Contract with RDC by attempting to disguise a design-build contract as a development agreement. (*Id.*, ¶ 52)

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

the charter or statute applicable requires certain steps to be taken before the making of a contract, and it is mandatory in terms, a contract not made in conformity therewith is *invalid . . .*")[7]

      3.      The Lease never went into effect by virtue of the FAA rejection, and as of <u>the date of the Amendment, the Property was no longer part of the Airport.</u>

The Lease—approved by Resolution No. 14-118—was expressly conditioned on the written approval of the FAA. (SOF, ¶ 12). It is undisputed that the FAA did not provide such approval—in fact, the FAA ***rejected*** the approval of the Lease, and instead recommended that the City purchase the release of the Property from the Quitclaim Deed conditions. (*Id.*, ¶ 13). Since FAA approval—a condition precedent to the effectiveness of the Lease[8]—did not occur, the Lease did not go into effect. (*Id.*). *See, e.g.*, *Contour Spa at Hard Rock, Inc. v. Seminole Tribe of Florida*, Case No. 10-60483-CIV, 2011 WL 1303163, at *4 (S.D. Fla. Mar. 31, 2011) (failure to obtain U.S. Secretary of the Interior's approval rendered the proposed lease between Native American tribe and spa operator, which was "expressly conditioned" upon the Interior Secretary's approval of the lease, "null and void *ab initio*.") (emphasis in original)

Following the FAA's rejection of the Lease, the City and the FAA entered into negotiations for the City to purchase the Property outright and obtain a release of the Quit Claim Deed restrictions. (SOF, ¶¶ 15-16). The City eventually acquiesced to the FAA's terms (as set

---

[7]      The City's affirmative defenses are unavailing. As explained in Premier's previously-filed response in opposition to the City's motion for summary judgment [D.E. 30], Premier has standing to judicially challenge the Resolutions because: (1) it was unlawfully deprived of the opportunity to submit a competitive bid to lease and develop the Property, and (2) it is a business competitor of FTL Waterresort and would suffer substantial damages arising from the City's lease of property to a competitor within the same geographic market. (*Id.*, pp. 17-19). Moreover, FTL Waterresort is not an indispensable party to this lawsuit. While FTL Waterresort could have sought to intervene (it did not), Premier was under no obligation to join it as a party-defendant. *See, e.g.*, *Homestead-Miami Speedway*, 828 So.2d at 412 (party which entered into contract with City of Miami intervened in lawsuit challenging contract as a violation of the City Charter requiring competitive bidding); *Volume Servs. Div. of Interstate United Corp. v. Canteen Corp.*, 369 So.2d 391, 394 (Fla. 2d DCA 1979) (top three bidders were allowed to intervene in lawsuit challenging City of Tampa's award of food and beverage concession at Tampa Stadium)

[8]      Approval of an agreement by a third party (in this case, the FAA) constitutes a condition precedent. *See In re Harrell*, 351 B.R. 221, 243 (Bankr. M.D. Fla. 2006) ("Under Florida law, if a contract contains a condition precedent, obligations under the contract do not mature until after the condition precedent has occurred.") (citing *Southern Internet Sys. v. Pritula*, 856 So.2d 1125, 1128 (Fla. 4th DCA 2003))

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

forth in a July 6, 2015 letter) and approved the purchase of the Property in a Resolution adopted by the City Commission on August 18, 2015, which authorized the City Manager to execute the July 6, 2015 letter agreement and Deed of Release. (*Id.*, ¶ 17). The City Manager executed these documents on September 8, 2015. (*Id.*, ¶ 18).

As a result of the City's agreement with the FAA, the Property ceased being a part of the Airport as of September 8, 2015. (*Id.*, ¶ 19).[9] The Lease Amendment, which acknowledges that the Property is no longer part of the Airport,[10] was approved by the City Commission on October 6, 2015, almost one month after the Property was removed from the Airport. (SOF, ¶ 22). Since the Property was no longer within the Airport, the City lacked the authority to utilize Section 8.10—which applies only to leases of land "within the city-owned airport known as Fort Lauderdale Executive Airport"—as a vehicle for circumventing Section 8.09. Therefore, Resolution No. 14-118 (which authorized the City Manager to execute the Lease, which was rendered void *ab initio* by the FAA's rejection thereof) and Resolution No. 15-213 (which failed to strictly comply with Section 8.10) are both invalid, null and void *ab initio*.

## CONCLUSION

For the foregoing reasons, Plaintiff's Motion for Summary Judgment should be granted in its entirety and an order entered pursuant to Fed. R. Civ. P. 56 (c) declaring: (1) that the City did not properly award the Lease and Amendment pursuant to Section 8.09 of the City's Charter; and (2) that the Lease and Amendment are invalid, null and void *ab initio*, and (3) issuing a permanent injunction prohibiting the City from the performance of the Lease and Amendment.

---

[9]   The FAA terms and Deed of Release expressly contemplate the removal of the Property from the Airport. (SOF, ¶ 16). In addition, several City employees, including the City's Airport Manager, Rufus James, testified that the Property is no longer part of the Airport. *Id.*, ¶ 19 (James Depo at 61:2-61:8; Bennett Depo at 39:8-39:15)

[10]   The Amendment contains a number of modifications from the original FAA-rejected Lease, including striking the words "within the Airport" at Section 12.01(b)(5), evidencing the fact that the Property was no longer part of the Airport. (SOF, ¶ 23)

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on 13th day of June, 2016, I electronically filed the foregoing

document with the Clerk of the Court using the CM/ECF system.  I also certify that the foregoing

document is being served this day on all counsel of record or pro se parties identified on the

attached Service List via transmission of Notices of Electronic Filing generated by CM/ECF.


BECKER & POLIAKOFF, P.A.
*Attorneys for Plaintiff*
1 E. Broward Blvd., Suite 1800
Ft. Lauderdale, FL 33301
Tel: 954-985-4133
Fax: 985-4199
grosen@bplegal.com
wcea@bplegal.com

By:_____/s Gary C. Rosen_____
        Gary C. Rosen, Esq.
        Florida Bar No. 310107
        William J. Cea, Esq.
        Florida Bar No. 951470

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550

*Case No. 15-62218-civ-Martinez/Goodman*
*Plaintiff's Motion for Summary Judgment and Incorporated Memorandum of Law*

## SERVICE LIST

**Premier Parks, L.L.C., a Delaware Limited Liability Company v. City of Fort Lauderdale, a Municipal Corporation of the State of Florida**

**Case No. 15-cv-62218**
**United States District Court, Southern District of Florida**

**(Fort Lauderdale Division)**

Edward Alexander Dion, Esq.
Kerry A. Parsons, Esq.,
*Attorney for Defendant*
Nabors, Giblin & Nickerson, P.A.
110 E. Broward Boulevard, Suite 1700
Fort Lauderdale, FL 33301
edion@ngnlaw.com
kparsons@ngnlaw.com
legal-admin@ngnlaw.com.

ACTIVE: P22811/372702:8631034_1

LAW OFFICES
BECKER & POLIAKOFF, P.A. • 1 EAST BROWARD BOULEVARD, SUITE 1800, FORT LAUDERDALE, FL 33301
TELEPHONE (954) 987-7550